UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| One Thousand & One Voices Africa Fund I Investors, L.P., One Thousand & One Voices Africa Fund I Investors, Ltd., and One Thousand & One Voices Management, LLC<br><br>Plaintiffs,<br><br>v.<br><br>Africa Investments, LLC; and TIP Founders, LLC<br><br>Defendants. | Civil Action No. _____ |

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs One Thousand & One Voices Africa Fund I Investors, L.P., One Thousand & One Voices Africa Fund I Investors, Ltd., and One Thousand & One Voices Management, LLC (collectively "Plaintiffs"), by and through Plaintiffs' attorneys, Blank Rome LLP, by and for their Complaint against Defendants Africa Investments, LLC and TIP Founders, LLC (collectively, "Defendants"), hereby allege as follows:

## PRELIMINARY STATEMENT

Defendant Africa Investments, LLC ("Africa Investments") was a Limited Partner in One Thousand & One Voices Africa Fund I, L.P. (the "Fund"), a private equity fund, of which Plaintiffs One Thousand & One Voices Africa Fund I Investors, L.P. and One Thousand & One Voices Africa Fund I Investors, Ltd. are the general partner ("General Partner") and the ultimate general partner, respectively. Plaintiff One Thousand & One Voices Management, LLC (the "Manager") is the entity retained by the General Partner to manage the Fund. All Plaintiff entities are managed by Hendrik Jordaan ("Jordaan"). Defendant TIP Founders, LLC ("TIP") is a Special Limited

1

Partner of the Fund, and owns certain names, service marks and trademarks that were licensed to Manager in order to operate and brand the Fund. John Coors ("Coors") manages Africa Investments and is the Chairman and largest membership interest holder of TIP.

The contractual relationship between the General Partner and Defendant Africa Investments, as well as the contractual relationship between the General Partner and Defendant TIP, are controlled by Third Amended and Restated Exempted Limited Partnership Agreement ("LPA"). *See* O'Kelly Decl., Ex. A.[1] Defendant Africa Investments, through the actions of Coors, engaged in a series of improper and/or unlawful actions designed to circumvent the controlling provisions of the LPA and force the removal of the General Partner as the general partner of the Fund without satisfying the "for cause" standard set forth in the LPA. *Id. at* § 4.6. In fact, notwithstanding the parties' clear contractual agreement that any action or proceeding relating in any way to the LPA ***shall*** be brought and enforced in this Court or the courts of the State of New York, Defendant Africa Investments filed a petition in the Cayman Islands to surreptitiously circumvent the clear venue provision and, in doing so, strategically avoid the jurisdiction of the American judicial system that the parties agreed was the exclusive judicial forum. As a result of these actions, and other action to the detriment of the Fund, on April 30, 2024, Defendant Africa Investments was removed as a Limited Partner pursuant to the removal provisions of the LPA. *Id. at* § 11.2. Accordingly, Plaintiffs seek a declaratory judgment as to the rights and obligations of the parties under the LPA related to the dispute between the parties.

The contractual relationship between the Manager and TIP is controlled by a License Agreement executed between the Manager and TIP on March 10, 2014 ("License Agreement"), which provided a license from TIP to the Manager to use certain names, service marks and

---

[1] "O'Kelly Decl." refers to the Declaration of Eamon O'Kelly, dated April 30, 2024, submitted in support of this Verified Complaint for Declaratory Relief.

trademarks in the course of managing the Fund. *See* O'Kelly Decl., Ex B (License Agreement). The License Agreement was terminated by TIP on April 17, 2023 as part of an improper scheme by Coors to disadvantage the Manager in its management of the Fund and to ultimately aid in his unlawful scheme to force the removal of the General Partner, through the action in the Cayman Islands. *See* O'Kelly Decl., Ex C (Notice of Termination, dated April 17, 2023). The strategic action by Coors, through his TIP entity, left the Manager and General Partner in a disadvantaged position in the effort to operate and manage the Fund and forced the Manager to utilize new phrases and terms to brand and describe the Fund and relevant initiatives. Coors' termination of the License Agreement also damaged the Fund, which was the express intended third-party beneficiary of the License Agreement. Subsequently, TIP alleged that the Manager, in performing its management duties on behalf of the General Partner, had committed "trademark infringement and false designation of origin under the federal Lanham Act (15 U.S.C. §§ 1114(1), 1125(a))" by continuing to use marks that were subject to the License Agreement and/or using variants that were similar to marks governed by the License Agreement. *See* O'Kelly Decl., Ex D ("Alleged Lanham Act Violations Letter", dated August 17, 2023). Plaintiffs deny that the efforts of the Manager to mitigate the damage caused by TIP's improper termination of the License Agreement, through the creation and use of new phrases for the branding of the Fund, constitute trademark infringement or any other violations of the Lanham Act or any other relevant laws or agreements. Accordingly, Plaintiffs seek a declaratory judgment as to the rights and obligations of the parties related to the alleged violations of the Lanham Act and related legal claims.

## THE PARTIES

1.      Plaintiff One Thousand & One Voices Africa Fund I Investors, L.P. is a Cayman Islands exempted limited partnership, registered to the address, Collas Crill Corporate Services

Limited, P.O. Box 709, Floor 2, Willow House, Cricket Square, Grand Cayman, KY1-1107.

2.      Plaintiff One Thousand & One Voices Africa Fund I Investors, Ltd. Is a Cayman Islands exempted company, registered to the address, Collas Crill Corporate Services Limited, P.O. Box 709, Floor 2, Willow House, Cricket Square, Grand Cayman, KY1-1107.

3.      Plaintiff One Thousand & One Voices Management, LLC, is a Delaware limited liability company, with its principal place of business at 14820 Compark Blvd, Suite 117, Parker, CO 80134.

4.      Each Plaintiff entity is managed and controlled solely by Hendrik Jordaan.

5.      Upon information and belief, Defendant Africa Investments, LLC is a Colorado limited liability company, registered to the address 102 N. Cascade, Ste 400, Colorado Springs, CO 80903.

6.      Upon information and belief, Defendant TIP Founders LLC, is a Colorado limited liability company, with a business address at 102 North Cascade Street, Suite 400, Colorado Springs, CO 80903.

7.      Coors serves as the manager of Defendant Africa Investments and upon information and belief is the only member of Africa Investments. Coors also serves as the Chairman of TIP and is the holder of the largest membership interest in TIP.

### JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1338(a), by virtue of 15 U.S.C. §1051 *et seq.,* 15 U.S.C.A. § 1121(a), 28 U.S.C. §2201, and 28 U.S.C. §1367(a).

9.      Specifically, this Court has jurisdiction to make a determination regarding the rights of Plaintiffs in response to claims by Defendants that the Manager, in performing its duties on behalf of General Partner, committed violations of the Lanham Act (15 U.S.C. §§ 1114(1),

1124(a)), and has supplemental jurisdiction under 28 U.S.C. §1367(a) to resolve the related claims between the parties that arise from the same controversy.

10.     Venue is proper because the parties have agreed that any dispute relating in any way to the controlling agreement between the parties shall be brought and enforced in the United States District Court for the Southern District of New York. Personal jurisdiction exists over the Defendants as a matter of contract (*see* LPA, O'Kelly Decl. Ex. A, § 15.12), and pursuant to 28 U.S.C. 1391.

## FACTUAL BACKGROUND

### The Fund and Controlling Agreement

11.     This dispute concerns the operation and dissolution of a Cayman Islands exempted limited partnership.

12.     On September 8, 2014, the LPA was entered into by and among the Fund, the General Partner, and the Fund's Limited Partners (the "Limited Partners"). *See* O'Kelly Decl. Ex. A, at 1.

13.     Defendant Africa Investments is one of the admitted Limited Partners and has expressly agreed to be bound by the terms of the LPA.

14.     Defendant TIP, as the Special Limited Partner, has also agreed to be bound by the terms of the LPA. *See* O'Kelly Decl. Ex. A, at 1 ("Recitals"); § 1.1 (Definitions of "Limited Partner" and "Special Limited Partner").

15.     There is no dispute between the parties that the LPA is the controlling Agreement setting forth the respective rights and responsibilities of the parties as to the operation and dissolution of the Fund.

16.     The terms of the LPA, as negotiated between the parties, provide significant autonomy and discretionary power to the General Partner (the Plaintiff) to operate the Fund. *Id.*

§§ 2.7, 4.1.

17.     In contrast, the rights of the Limited Partners to interfere in the operation and/or dissolution of the Fund are expressly limited under the terms of the LPA:

> *5.1 No Participation in Management, etc. Except as otherwise provided in this Agreement, no Limited Partner shall take part in the management, conduct of business or control of the Partnership's affairs, transact any business in the Partnership's name or have the power to sign documents for or otherwise bind the Partnership. <u>Except as provided in Section 4.6, no Limited Partner shall have the right to vote for the election, removal or replacement of the General Partner</u>.*

*Id.* § 5.1 (emphasis added).

18.     Among the key provisions of the LPA that were negotiated and agreed to between the Parties was the standard that must be met to remove the General Partner.

19.     The LPA requires that any Limited Partner seeking to remove the General Partner must prove that there is a "Cause Event."  *Id.* § 4.6.

20.     The LPA clearly defines what constitutes a "Cause Event." A Cause Event includes "a final determination by a court of competent jurisdiction that the General Partner willfully and materially breached its duties under this Agreement." *Id.* § 1.1 (definition of "Cause Event").

21.     Defendant Africa Investments has made no allegations that a Cause Event has occurred that would justify removing the General Partner in accordance with LPA, Section 4.6.

22.     It is undisputed that the parties agreed in the LPA that the "General Partner may be removed *only* pursuant to this Section 4.6." *Id.* § 4.6(d) (emphasis added))

23.     The parties also agreed in the LPA that in the event that a winding up or dissolution of the Fund is initiated, the General Partner "*shall*" be the "Liquidating Agent," unless the General Partner elects to appoint another to that position or the General Partner itself is subject

to a winding up or dissolution proceeding. *Id.* § 1.1 (definition of "Liquidating Agent") (emphasis added).

24.     There is no provision in the LPA providing for the removal of General Partner as Liquidating Agent. *Id.*

25.     There is no provision granting the Limited Partners the power to appoint the Liquidating Agent, unless the dissolution has been caused by the bankruptcy or dissolution of the General Partner pursuant to Section 13.1(b). *Id.*

26.     There has been no bankruptcy or dissolution of the General Partner that would enable the Limited Partners to appoint the Liquidating Agent.(*Id.* § 13.1(b).

27.     One of the powers granted to the General Partner, with the consent of the Conflicts Review Board (as defined in the LPA), is the power to remove a Limited Partner where "the General Partner determines in its *sole* discretion that such Limited Partner's investment in the Partnership is detrimental to the synergies of other Limited Partners or not in the best interests of the Partnership." *Id.* § 11.2(a) (emphasis added).

28.     The LPA includes broad indemnification provisions that protect the rights of the General Partner both to be indemnified and to be advanced funds in order to provide for the defense of any claims brought against the General Partner related to the LPA**.** The indemnification provisions, under the LPA, afford the General Partner protection regardless of whether the General Partner remains in the position and requires that no amendment shall reduce or restrict the extent of the indemnification provisions. *See, e.g.,* O'Kelly Decl., Ex. A §§ 4.6(d), 10.2(a), (h).

<u>History of the Fund</u>

29.     Coors is an individual with a net worth that, upon information and belief, qualifies him as a billionaire and is a member of the family that controls the Coors brewing empire.

30.      In 2012, Jordaan, who was born in South Africa and became a U.S. citizen, was

7

previously the head of Private Equity Investments and Buyouts for Morrison and Foerster LLP, one of the world's 100 largest law firms.

31.     In 2012, Coors convinced Jordaan to leave his lucrative law practice that he built for 15 years to launch and run the Fund.

32.     Coors and Jordaan agreed that the Fund would focus on investing in Africa.

33.     Jordaan was swayed by Coors' claims that he wanted to create a Fund where investments would be made in the long-term growth of Africa and the creation of jobs and improvement of lives in Africa would be key goals of the Fund.

34.      Coors also assured Jordaan that his influence, personal network,  and efforts would facilitate capital raising towards a $300 million targeted fund.

35.     Before launching the main Fund, in 2012 Coors and Jordaan started "The Impact Project" as a platform to recruit potential investee families and potentially to raise some initial seed capital.

36.     This led to the establishment of the entity called TIP Founders, LLC, with Coors owning the largest stake in TIP and serving as its Chairman.

37.     Because Coors and a number of others who invested in TIP did not want general partner liability, TIP was given a "synthetic general partner interest" – it is a "Special Limited Partner" in the Fund, but with an economic interest that mirrors that of the General Partner.

38.     One of the early functions funded by TIP was the development of branding to be used by the ultimate Fund. Accordingly, a number of names, service marks and trademarks were developed and ultimately registered by TIP including "1K1V," "Three Dimensional Capital" and "One Thousand & One Voices."

39.     On March 10, 2014, TIP licensed the rights to these marks to the Manager for use

in managing the Fund. *See* O'Kelly Decl., Ex. B.

40. The License Agreement was terminated by TIP on April 17, 2023 as part of an improper scheme by Coors to disadvantage the Manager in its management of the Fund and to ultimately aid in his unlawful scheme to force the removal of the General Partner through the Cayman Islands. *See* O'Kelly Decl., Ex. C.

41. The strategic action by Coors, through his TIP entity, left the Manager and General Partner in a disadvantaged position in the effort to operate and manage the Fund and forced the Manager to utilize new phrases and terms to brand and describe the Fund and relevant initiatives.

42. Subsequently, TIP alleged that the Manager, in performing its management duties on behalf of the General Partner, had committed "trademark infringement and false designation of origin under the federal Lanham Act (15 U.S.C. §§ 1114(1), 1124(a))" by continuing to use marks that were subject to the License Agreement and/or using variants that were similar to marks governed by the License Agreement. *See* O'Kelly Decl., Ex. D.

43. The initial fundraising of the Fund was hampered by restrictions put in place by Coors that only families and not institutions could invest and that those families must generally meet with Coors and pass his interview, meaning that they had to share his religious and conservative views.

44. While Coors is an extremely wealthy and influential individual, upon information and belief, he does not have any prior experience with managing private equity funds.

45. Early in the relationship between the parties, despite LPA limitations on the involvement of Limited Partners in managing the Fund, and despite Coors only committing approximately 20% of the Fund's capital, Coors took actions which indicated that he believed he

could run the Fund like one of his private companies.

46.      Despite the slow start caused by Coors' restrictions on who could invest, the Fund raised approximately $125 million, which was less than the $300 million that Coors originally indicated could be reached.

47.      The Fund began investing in African companies in 2015.

48.      The Manager is the investment manager of the Partnership, having been engaged pursuant to the terms of the management agreement entered into on or about 28 August 2013 between the General Partner, the Manager, and the Partnership.

49.      The Manager, on behalf of the General Partner, managed the Fund, with comparatively successful results, through a number of adversities, including a global pandemic.

50.      The results of the Fund included gross and net IRR as of March 31, 2022 of 15.9% and 3.2% respectively.

51.      The Fund was also responsible for investments in nine portfolio companies that created or sustained thousands of jobs in Africa since the Fund's inception.

52.      Sometime in 2022, upon information and belief, Coors became dissatisfied with Jordaan.

53.      Coors expressed that his displeasure was not based on one single event, but was the result of a combination of things, none of which constituted a "Cause Event" for purposes of removing the General Partner.

54.      Coors indicated to Jordaan that one of the factors that made him unhappy was that Jordaan was going through a second divorce and Coors believed that the divorce "did not look good."

55.      In approximately June of 2022, Coors also began to increase his attempts to

interfere in the day-to-day management of the Fund.

56.     By way of example, on June 22, 2022, Coors texted Jordaan as follows: "Please close Beefmaster [a Fund portfolio company] tomorrow and stop negotiating."  When the General Partner was able to dispose of the Beefmaster investment – albeit past Coors "deadline" – at a 2.1x gross return, Coors was not pleased with this outcome, calling it "sub-par".  On August 15, 2022, Coors texted Jordaan an ultimatum prior to a meeting the following Monday scheduled for a Starbucks in Evergreen, Colorado: "Monday 4:30pm Evergreen Starbucks. … you as GP, will need at least two more exits with "target" net returns and with cash to LP's [sic] by the end of 2022...  For those two, detailed Deal sheets need to be provided with net returns reflecting ROI's with top quartile results (US)."

57.     When Jordaan informed Coors that he cannot "guarantee" exits or specific returns, Coors became physically agitated and insisted on the same as a condition to Jordaan's continued involvement with the Fund.

58.     On November 7, 2022, in advance of their meeting the next day, Coors texted Jordaan as follows: "I don't want you to come to tomorrow's meeting with unrealistic expectations. This will not be a long conversation.  I am not interested in trying to clear up misunderstandings from the past.  … A wise man once said, 'Help them to know that while they are free to choose whatever they want, they are not free to choose the consequences.'"

59.     It was clear to Jordaan that Coors had decided that, irrespective of what the LPA provides, the "consequences" he intended to cause were the General Partner's removal and the end of Jordaan's involvement with the Fund.

60.     At the meeting, Coors told Jordaan that he "protected [Jordaan] as long as he could" but that he needed to "move on".

61.     Jordaan noted to Coors that he had invested almost a decade of his life to building the Fund and made clear that he is not an employee that Coors could simply "fire" as in the private companies that Coors controls.

62.     At this refusal Coors became visibly upset and indicated to Jordaan that there would be "consequences" to Jordaan. It was apparent to Jordaan that Coors was not used to people saying no to him and that he took Jordaan's refusal to bend to his will extremely personally.

63.     Coors indicated that he is willing to "fight" and that Jordaan was "very clever" in how he "drafted the LPA" (which Jordaan took to be a reference to the fact that the LPA provides that the General Partner can only be removed for a "Cause Event").  Coors made it clear to Jordaan that he was going to seek to remove him from his role at the General Partner regardless of the provisions of the LPA and regardless of the fact that Coors only committed approximately 20% of the Fund's capital.

<u>Coors' Campaign to Remove Jordaan at the General Partner</u>

64.     Following Jordaan's refusal to resign at General Partner of the Fund, Coors again increased the frequency with which he attempted to interfere with the day-to-day operations of the Fund.

65.     Coors began to systematically interfere with the third-party vendors (e.g., financial service providers) as well as employees that provided services for the benefit of the Fund.

66.     Upon information and belief, in multiple cases the impact of Coors' interference with third party vendors was to intimidate the vendors into discontinuing their work for the Fund.

67.     Upon information and belief, Coors also interfered with Limited Partner meetings of the Fund by overtly encouraging other Limited Partners not to attend.

68.     As a result of Coors' actions, Limited Partners have not attended meetings of the Fund.

69.     Upon information and belief, Coors also made multiple misrepresentations about the General Partner, the Manager, and Jordaan to other Limited Partners in an effort to rally them behind Coors' unlawful scheme to circumvent the controlling provisions of the LPA through the action in the Cayman Islands.

70.     Coors also directly interfered with the orderly operation of the Fund utilizing his control over TIP to terminate the Manager's license agreement to use the licensed marks that were specifically created to use on behalf of the Fund. *See* O'Kelly Decl., Ex C.

71.      This strategic action by Coors, through TIP, left Manager and General Partner in a disadvantaged position in their efforts to operate and manage the Fund and forced the Manager to utilize new phrases and terms to brand and describe the Fund and relevant initiatives.

72.     Over a decade of goodwill was destroyed when the Manager, due to Coors' actions, was forced to change the name under which it operated for the benefit of the Fund.

73.     Coors then utilized his control over TIP to try and harm the General Partner and Manager further by improperly claiming that the Manager, in performing its management duties on behalf of the General Partner, had committed "trademark infringement and false designation of origin under the federal Lanham Act (15 U.S.C. §§ 1114(1), 1124(a))" by continuing to use marks that were subject to the License Agreement and/or using variants that were similar to marks governed by the License Agreement. *See* O'Kelly Decl., Ex D.

74.     Coors also undertook an effort to force a "buyout" of Jordaan as General Partner with the express stated purpose of him and certain Limited Partners taking over the management and operation of the Fund.

75.     After using the negotiations to gain information to which he was not entitled, Coors and certain other Limited Partners with which he was working abandoned the negotiations

and refused to accept a resolution that contained the basic terms that were verbally agreed to by the parties at the outset. It has become clear that Coors never intended to settle with the General Partner on the terms verbally agreed to and was, instead, using the negotiations as part of a broader scheme to force the General Partner's removal through the action in the Cayman Islands.

76.     Coors also used confidential information gained in the negotiations and obtained at other times through his roles as manager of Africa Investments and TIP respectively, to harm the General Partner, the Manager and the Fund, by sharing such confidential information and trade secrets with third parties and other individuals who were not entitled to receive such information in direct contravention of the LPA's confidentiality requirements. *See* O'Kelly Decl., Ex A, § 15.3.

77.     Coors next led an effort to place the Fund into formal liquidation by encouraging the other Limited Partners to sign a liquidation resolution under the LPA.

78.     Coors' efforts were successful and he, on behalf of a majority of the Limited Partners, served the General Partner with a liquidation resolution on November 27, 2023.

79.     Pursuant to the LPA, the General Partner then automatically became the Liquidating Agent, with an obligation under section 13.2 of the LPA to liquidate the assets of the Fund. *See* O'Kelly Decl., Ex A, § 13.2.

80.     At the time Coors led the effort of the Limited Partners to send the liquidation resolution, the Fund was already in "wind-up mode" since the Fund's investment period had already expired.  Hence, the Fund was *already* in the process of liquidating assets when Coors pushed the Fund into "liquidation."

81.     Coors and the other Limited Partners did not consult with the General Partner prior to serving the Liquidation Notice.

82.     Had they consulted with the General Partner, Jordaan would have advised them

that the service of the liquidation resolution would have grave consequences for the Fund.

83.     Since the Fund was already liquidating when Coors forced through the liquidation resolution, his intent was clearly not liquidation.  Instead, it has become clear his intent was to use the liquidation resolution as a guise to effect a constructive removal of the General Partner and to utilize the Cayman judicial system as a tool to circumvent the choice of venue provision in the LPA.

84.     The most severe negative impact of the liquidation resolution was to cause the Fund to be in immediate default of a multi-million dollar credit facility with its primary South African bank (the "Credit Facility").

85.     By causing the Fund to default on the Credit Facility through the service of the liquidation resolution, the financial stability of the Fund was placed in jeopardy as the bank threatened to foreclose on the Fund's assets.

86.     By causing the Fund to default on the Credit Facility through the service of the liquidation resolution, the financial stability of a number of portfolio companies who had credit facilities with the same bank was placed in jeopardy.

87.     In an attempt to mitigate the damage done by the liquidation resolution, on or about December 18, 2023 the General Partner issued Capital Call #43 ("Capital Call #43") to the Limited Partners to allow the Fund to pay down the credit facility and stabilize the financial situation of the Fund and the impacted portfolio companies. *See* O'Kelly Decl., Ex E (Capital Call #43, December 18, 2023).

88.     Coors, on behalf of Defendant Africa Investments, erroneously claimed there was no basis under the LPA allowing the General Partner to issue Capital Call #43.

89.     Coors caused further instability to the financial circumstances of the Fund by

refusing to meet Capital Call #43.

90.     Upon information and belief, Coors also actively encouraged the other Limited Partners not to meet Capital Call #43.

91.     As a direct result of Coors' actions, the financial situation of the Fund was seriously and negatively impacted.

92.     In order to pay down the defaulted Credit Facility the General Partner was forced to sell an asset of the Fund under exigent circumstances and at a significantly lower price than would have been possible had Coors not engaged in the aforementioned actions.  This damaged the Fund, the General Partner, and multiple third parties who hold interests in the Fund's portfolio companies.

93.     Upon information and belief, the actions of Coors were specifically designed to place the Fund in a disadvantaged financial situation in order to deprive the General Partner of proper access to funds under the LPA to meet the Fund's indemnity obligations to the General Partner.

94.     Upon information and belief, the actions of Coors were specifically designed to place the Fund in a disadvantaged financial situation in order to try and force the General Partner to resign.

95.     Upon information and belief, Coors' actions were specifically designed to force the General Partner to take on the additional role of Liquidating Agent under the LPA.

96.     Based on Coors' subsequent actions it is now apparent that causing the General Partner to become the Liquidating Agent was the first step in a scheme by Coors designed to circumvent the LPA's express requirement that the General Partner could only be removed after the occurrence of a "Cause Event."

97.     Upon information and belief, Coors unlawfully conspired with other Limited Partners to effect a scheme whereby they would collectively seek to circumvent the controlling provision of the LPA by strategically trying to constructively remove the General Partner under the guise of demanding that a new Liquidating Agent to be appointed.

98.     Upon information and belief, for this reason, Coors, through defendant, Africa Investments, attempted to circumvent the venue selection clause that gave jurisdiction to the courts in New York and filed a petition (the "Petition") on January 26, 2024 in the Grand Court of the Cayman Islands (the "Cayman Court") asking the Cayman Court to override the clear terms of the LPA and to appoint a different Liquidating Agent.

99.     Defendant Africa Investments' Petition in the Cayman Court purported to be "only" a request to substitute a different Liquidating Agent pursuant to the Cayman Statutes, and therefore, according to Defendant Africa Investments, was outside of the clear agreement of the parties regarding venue, which requires that "ANY ACTION OR PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT *SHALL* BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF NEW YORK OR (TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFORE) OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK." (O'Kelly Decl., Ex A, § 15.12 (emphasis added).

100.     Upon information and belief, Coors intentionally misstated multiple factual issues in order to gain the support of other Limited Partners in endorsing his Petition for Removal of the General Partner as Liquidating Agent.

101.     The Petition in the Cayman Court was replete with factual misstatements regarding the General Partner and Jordaan personally.

102.     The Petition in the Cayman Court was replete with baseless, slanderous allegations against the General Partner and Jordaan personally.

103.     In filing the Petition in the Cayman Court, Defendant Africa Investments, adopted and repeated the allegations of TIP that Jordaan, acting through the Manager and as the manager of the General Partner, was responsible for committing "trademark infringement and false designation of origin under the federal Lanham Act (15 U.S.C. §§ 1114(1), 1124(a))" by continuing to use marks that were subject to the License Agreement and/or using variants that were similar to marks governed by the License Agreement.

104.     In the Petition in the Cayman Court, Defendant, Africa Investments offered the alleged trademark infringements as "factual" support for its request that the Cayman Court replace the General Partner as liquidator and transfer all rights and responsibilities of the General Partner to the new Liquidating Agent to the exclusion of the General Partner.

105.     Upon information and belief, the Petition in the Cayman Court contained far more extensive factual pleadings than is customary for an initial notice pleading in that court, indicating that Coors' true intent was to inflict maximum reputational damage on the General Partner and Jordaan—even when it came at the expense of damaging the Fund, its investments, and employees in African companies that Coors publicly professed should get "jobs" and "prosperity" through the Fund's investments.

106.     Upon information and belief, the Petition was constructed by Coors in order to place maximum pressure on the General Partner to resign without regard to the detrimental impact that it would have to the ongoing liquidation process in South Africa.

107.     Upon information and belief, as part of Coors' effort to place maximum pressure on the General Partner to resign, he or someone acting on his behalf, then alerted a specific news

outlet to the existence of the Petition.

108.    That news outlet then published an article publicizing the detailed, baseless, false and slanderous claims contained in the Petition.

109.    The impact of the public release of the Petition's baseless claims was to cause the Fund's assets to become further distressed because, among other harms, it was now publicized that the assets were being liquidated under exigent circumstances.

110.    As Defendant Africa Investments filed additional pleadings and engaged in additional communication through its Cayman counsel, the calculated boldness of its improper scheme to circumvent the LPA became apparent.

111.    First, through counsel Defendant Africa Investments expressed its position that the General Partner was only entitled to indemnity and advancement of attorneys' fees under the LPA if the General Partner was taking legal positions that *agreed* with the will of the Defendant Africa Investments and certain Limited Partners—thus, irrespective of what the LPA provides, Defendant Africa Investments should "decide" if the General Partner is entitled to indemnification.

112.    No such limitation on the General Partner's right to indemnity and advancement of funds is present in the LPA. *See, e.g.*, O'Kelly Decl., Ex A, § 10.2.

113.    The Defendant Africa Investments also violated the LPA by taking direct action in the Cayman Court to seek to freeze the assets of the Fund with the apparent purpose of stopping the General Partner from paying attorneys who were representing him to defend his contractually agreed upon rights under the LPA, including against the action in the Cayman Court.

114.    Defendant Africa Investments also affirmed to the Cayman Court in pleadings that it was <u>not</u> seeking to move under the LPA "For Cause" standard found in Section 4.6 of the LPA, which indisputably controls any attempt to remove the General Partner.

115.     However, the substance of Defendant Africa Investments' pleadings confirmed that Defendant Africa Investments was attempting to circumvent the General Partner's rights under the LPA by effecting a constructive removal of the General Partner under the guise of "simply" replacing the General Partner as Liquidating Agent.

116.     Defendant Africa Investments' request for relief expressly asked the Cayman Court for an order that "[a]ll rights or property of every description of the Partnership, including all choses (sic) in action, held or deemed to be held by the GP and/or the Ultimate GP of the Partnership shall vest without the requirement for further formalities in the Liquidators and shall be held by Liquidators in accordance with the ELP Act."

117.     Defendant Africa Investments' request for relief also expressly asked the Cayman Court for an order clarifying that the "Liquidators powers are exercisable to the exclusion of the GP and/or the Ultimate GP and the GP and Ultimate GP shall forthwith have no authority or power to act in relation to the Partnership other than at the direction and/or with the consent of the Liquidators."

118.     When Plaintiffs responded to the Petition in the Cayman Court and refuted the factual misstatements and fallacies set forth in Defendant Africa Investments' Petition, Defendant Africa Investments pivoted the legal argument on which the Cayman Petition was based and argued that all of the detailed and voluminous factual allegations it made in its own petition were "irrelevant" and should not be considered by the court.

119.     Defendant Africa Investments then introduced the new argument that the court should replace the General Partner as liquidator without any factual findings, based solely on its submission that a majority of the Limited Partners (who are largely personal friends or aligned with Coors' conservative political initiatives) voted to have the General Partner removed as

Liquidating Agent.

120.     Defendant Africa Investments invited the Cayman Court to create a dangerous new precedent where any negotiated "for cause" provision for the removal of a general partner of any investment fund would effectively be moot as a majority of Limited Partners could simply circumvent the fund's constitutive restrictions on removal by placing the fund in liquidation and then, by majority vote, remove the general partner.

121.     Defendant Africa Investments made this argument in direct contradiction of  (a) the express prohibition contained in Section 4.6(d) of the LPA that the General Partner can be removed only pursuant to Section 4.6, and (b) the express provision of Section 5.1 of the LPA that "[e]xcept as provided in Section 4.6, no Limited Partner shall have the right to vote for the election, removal or replacement of the General Partner."

122.     Defendant Africa Investments has engaged in an obvious scheme to subvert justice and deprive the General Partner of its bargained-for rights under the LPA by constructively removing the General Partner without complying with the requirements of Section 4.6 of the LPA. *See* O'Kelly Decl., Ex A, §§ 4.6, 5.1.

123.     Defendant Africa Investments' scheme also seeks to deprive the courts of the United States of America of their jurisdiction that was clearly agreed upon in the LPA.

124.     Defendant Africa Investments' actions clarified that it strategically and intentionally abused the judicial process in the Cayman Courts by filing a purported liquidation action, that is in reality a two party dispute under the LPA, outside of the Courts of New York in violation of the LPA's venue clause, which was filled with voluminous, false factual allegations, that it was later revealed Defendant Africa Investments never intended to rely on, and upon information and belief, were only included in the original petition in order to tarnish the General

Partner's reputation and cause maximum damage to the General Partner in an effort to pressure the General Partner into resigning.

125.    The Plaintiffs have objected, in the Cayman proceedings, to the Cayman Court's jurisdiction.

126.    Defendant Africa Investments' actions also clarified that it strategically and intentionally abused the judicial process in the Cayman Court by filing an action that purported to request only that the Liquidating Agent be replaced, while then demanding relief that would result in a clear and complete, constructive removal of the General Partner in violation of numerous provisions of the LPA.

127.    Defendant Africa Investments' removal as a Limited Partner of the Fund removes its standing to continue its abuse of judicial process by continuing to pursue the fraudulent action in the Cayman Court.

## **FIRST CAUSE OF ACTION**

### **(Declaratory Judgment under the Lanham Act)**

128.    Plaintiffs repeat and reallege the allegations set forth in paragraph 1 through 127 as if fully set forth herein at length.

129.    Plaintiffs and Defendants disagree as to the scope of their respective rights and responsibilities under the License Agreement, and as to whether TIP's purported termination of the License Agreement was proper and had any legal effect.

130.    Plaintiffs deny that the actions of the Manager, in performing its management duties on behalf of the General Partner and in acting to mitigate the damage caused by TIP's improper termination of the License Agreement, constitute trademark infringement or any other violations of the Lanham Act, 15 U.S.C. §§ 1114(1), 1124(a)), or any other relevant laws or

agreements.

131.    An actual and justiciable controversy exists between Plaintiffs and Defendant as to whether Plaintiffs have acted in violation of the Lanham Act.

132.    There is no adequate remedy at law.

133.    Based on the foregoing, Plaintiffs request a declaration under the Federal Declaratory Judgment Act, 28 U.S.C.A. § 2201(a), as to the rights and obligations of the parties related to the alleged violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq*. and related legal claims.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment)

134.    Plaintiffs repeat and reallege the allegations set forth in paragraph 1 through 133 as if fully set forth herein at length.

135.    Plaintiffs and Defendants disagree as to the scope of the rights provided under the LPA with respect to Defendant Africa Investments' efforts to force the removal, constructive or otherwise, of the General Partner and deprive the General Partner of its right to indemnity, advancement of funds, and other protections in order to defend its legal positions.

136.    An actual and justiciable controversy exists between Plaintiffs and Defendants as to the parties' respective rights under the LPA.

137.    There is no adequate remedy at law.

138.    Based on the foregoing, Plaintiffs request a declaration that: A) Plaintiffs are entitled to the benefit of the indemnity provisions set forth in the LPA and that Defendant Africa Investments shall take no action to attempt to interrupt Plaintiffs' control of and access to funds set aside to satisfy those indemnity provisions; B) Capital Call #43 was properly issued by the

General Partner under the terms of the LPA; C) The General Partner acted appropriately under the LPA by selling assets to resolve the credit facility default and any claim to the contrary by Defendant Africa Investments is precluded by Defendant Africa Investments' actions in issuing the liquidation resolution and refusing to meet Capital Call #43; D) Any action to remove a Plaintiff entity as General Partner, either directly or constructively, must be brought in either the courts of the state of New York or (to the extent subject matter jurisdiction exists) of the United States Court for the Southern District of New York; E) Any action to remove a Plaintiff entity as General Partner, either directly or constructively, must be brought pursuant to the standard set forth in § 4.6 of the LPA; F) Any action to appoint a liquidator *and* transfer all rights and responsibilities of the General Partner to the liquidator to the exclusion of the General Partner's right to act would serve as a constructive removal of the General Partner, must be brought in either the courts of the state of New York or (to the extent subject matter jurisdiction exists) of the United States Court for the Southern District of New York and must be brought pursuant to the standard set forth in § 4.6 of the LPA; G) Defendant Africa Investments does not have standing to continue to pursue the action in the Cayman Islands because it is no longer a Limited Partner of the Fund; H) Any action by any party seeking to assert any legal rights under the LPA, or a violation of those rights, must be brought in either the courts of the state of New York or (to the extent subject matter jurisdiction exists) of the United States Court for the Southern District of New York; and I) The resolution of this declaratory judgment complaint does not preclude or otherwise prejudice Plaintiffs' rights to pursue further legal remedies at the time they become ripe for action, including but not limited a breach of contract action under the LPA, against Defendant Africa Investments or any other Limited Partners of the Fund.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court:

1.    Declare the respective rights, duties and obligations of the parties as to the alleged violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq*,

2.    Declare the respective rights, duties and obligations of the parties under the LPA with respect to the dispute between the parties;

3.    Grant judgment that:

    a.    Plaintiffs are entitled to the benefit of the indemnity provisions set forth in the LPA and that Defendant Africa Investments shall take no action to attempt to interrupt Plaintiffs' control of and access to funds set aside to satisfy those indemnity provisions;

    b.    Capital Call #43 was properly issued by the General Partner under the terms of the LPA;

    c.    The Manager, on behalf of the General Partner, acted appropriately in mitigating damages attributable to TIP's termination of the License Agreement and such actions did not violate the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.;

    d.    The General Partner acted appropriately under the LPA by selling assets to resolve the credit facility default and any claim to the contrary by Defendant Africa Investments is precluded by its actions in issuing the liquidation resolution and refusing to meet Capital Call #43;

    e.    Any action to remove a Plaintiff entity as General Partner, either directly or constructively, must be brought in either the courts of the state of New York or (to the extent subject matter jurisdiction exists) of the United States Court

for the Southern District of New York;

f.      Any action to remove a Plaintiff entity as General Partner, either directly or constructively, must be brought pursuant to the standard set forth in § 4.6 of the LPA;

g.      Any action to appoint a liquidator and transfer all rights and responsibilities of the General Partner to the liquidator to the exclusion of the General Partner's right to act would serve as a constructive removal of the General Partner, must be brought in either the courts of the state of New York or (to the extent subject matter jurisdiction exists) of the United States Court for the Southern District of New York and must be brought pursuant to the standard set forth in § 4.6 of the LPA;

h.      Defendant Africa Investments does not have standing to continue to pursue the action in the Cayman Islands because it is no longer a Limited Partner of the Fund.

i.      Any action by either party seeking to assert any legal rights under the LPA, or a violation of those rights, must be brought in either the courts of the state of New York or (to the extent subject matter jurisdiction exists) of the United States Court for the Southern District of New York;

j.      The resolution of this declaratory judgment complaint does not preclude or otherwise prejudice Plaintiffs' rights to pursue further legal remedies at the time they become ripe for action, including but not limited a breach of contract action under the LPA, against Defendant Africa Investments or any other Limited Partners of the Fund; and

k.      Such other and further relief as the Court may deem just and proper.


Dated:  April 30, 2024


                                    Respectfully submitted,

                                    **BLANK ROME LLP**

                                    Craig Weiner
                                    1271 Avenue of the Americas
                                    New York, New York 10020
                                    Telephone: (212) 885-5000
                                    Facsimile: (212) 885-5001
                                    Email: craig.weiner@blankrome.com
                                    *Attorney for Plaintiffs, One Thousand &*
                                    *One Voices Africa Fund I Investors, L.P.,*
                                    *One Thousand & One Voices Africa Fund*
                                    *I Investors, Ltd., and One Thousand &*
                                    *One Voices Management, LLC*

**VERIFICATION**

HENDRIK JORDAAN, being duly sworn, deposes and states that:

1. I manage the affairs of the above-named plaintiffs One Thousand & One Voices Africa Fund I Investors, L.P., One Thousand & One Voices Africa Fund I Investors, Ltd., and One Thousand & One Voices Management, LLC;

2. I have read the foregoing Verified Complaint for Declaratory Judgment ("Complaint") and am familiar with the matters described therein;

3. I verify under penalty of perjury under the laws of the United States of America that the matters alleged as facts in the Complaint are true, except to those matters stated to be alleged on information and belief, and as to those matters, I believe them to be true.


Dated: April 30, 2024

_____
Hendrik Jordaan

167856.99990/135466171v.4